## S02A1148. BRAITHWAITE v. THE STATE.
(572 SE2d 612)

FLETCHER, Chief Justice.

A jury convicted Damion Braithwaite for his role in the shooting deaths of Chauncey Fleming, Eddie McMillian, and Nekeba Turner. Although the prosecutor violated the prohibition against making "golden rule" arguments in his closing argument, Braithwaite's trial counsel made the strategic decision not to object and draw attention to this portion of the argument. Because Braithwaite is unable to show that this strategy denied him constitutionally effective legal representation and his other enumerations are without merit, we affirm.[1]

Taken in the light most favorable to the jury's verdict, the evidence at trial showed that Braithwaite and his four accomplices — Dukar Watson,[2] Emmanuel Lord, Anthony Davis, and James Ward — agreed to rob Fleming and kill him with his own gun. Each accomplice was to shoot Fleming so that they would all be culpable and, therefore, less likely to incriminate one another. Once at Fleming's apartment, they smoked marijuana and watched television. Braithwaite found Fleming's gun, and, upon his signal, the five men subdued Fleming and the apartment's two other occupants, McMillian and Turner, who were sleeping in another room. Braithwaite killed Turner by shooting her in the head. Some of the remaining men took

---

[1] The crimes were committed on February 5, 1996, and appellant was indicted on March 20, 1998. A jury found Braithwaite guilty on July 21, 2000 of three counts of malice murder, three counts of felony murder, three counts of aggravated assault, and three counts of illegal firearm possession. Appellant was sentenced to three consecutive life sentences for the malice murder convictions, and three consecutive five-year sentences for the firearm possession convictions. The felony murder convictions were vacated by operation of law, and the aggravated assault convictions were merged by operation of fact into the malice murder convictions. Appellant filed motions for new trial on August 7, 2000, and August 17, 2000, and amended the motions on April 30, 2001. The trial court denied the motions, as amended, on February 22, 2002. The notice of appeal was filed on March 11, 2002, the appeal was docketed on April 17, 2002, and the appeal was orally argued on July 9, 2002.

[2] This Court affirmed Watson's convictions for the three murders in *Watson v. State*, 274 Ga. 689 (558 SE2d 704) (2002).

turns shooting and killing Fleming and McMillian.

Approximately twenty months later, Braithwaite's wife, Hafitha Miller, informed police that Braithwaite had told her about the murders while holding her hostage. Several months later, Braithwaite was arrested in New York. He gave police a false name, refused to be fingerprinted, and gnawed on his fingertips. After being released in New York, he was arrested in North Carolina. The North Carolina police were able to fingerprint him only after obtaining a court order that allowed them to sedate Braithwaite. He was subsequently extradited to Georgia to stand trial for these crimes.

1. Braithwaite's contention that the testimony of his accomplices and his ex-wife was unreliable was an issue for the jury to decide.[3] The accomplice testimony was corroborated, and the evidence at trial was sufficient to enable a rational trier of fact to find Braithwaite guilty beyond a reasonable doubt of the crimes for which he was convicted.[4]

2. (a) Braithwaite asserts that the State violated the "golden rule" prohibition during its closing arguments. However, he failed to object contemporaneously to this portion of the State's closing argument and, therefore, he has waived that enumeration of error.[5]

(b) Braithwaite also contends that his trial counsel was ineffective in failing to object to the State's golden rule argument. To prevail on a claim of ineffective assistance of trial counsel, Braithwaite bears the burden of showing that counsel was deficient and that, but for the deficiency, there was a reasonable probability that the outcome of his trial would have been different.[6] A failure to make either of these showings is fatal to an ineffectiveness claim.[7] Furthermore, there is a strong presumption that trial counsel provided effective representation,[8] and we will not use hindsight to judge counsel's reasonable trial strategy and tactics.[9]

We begin our analysis by examining whether the State violated the proscription against "golden rule" arguments. A "golden rule" argument is one that, regardless of the nomenclature used, asks the jurors to place themselves in a victim's position.[10] We have repeatedly held that a golden rule argument is improper, and we conclude that

---

[3] OCGA § 24-9-80; *Jenkins v. State*, 269 Ga. 282, 286 (498 SE2d 502) (1998).

[4] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[5] *Mullins v. State*, 270 Ga. 450, 451 (511 SE2d 165) (1999).

[6] *Strickland v. Washington*, 466 U. S. 668, 687-688 (104 SC 2052, 80 LE2d 674) (1984).

[7] Id.

[8] *Smith v. Gaither*, 274 Ga. 39 (549 SE2d 351) (2001); *Dewberry v. State*, 271 Ga. 624 (523 SE2d 26) (1999).

[9] *Slade v. State*, 270 Ga. 305 (509 SE2d 618) (1998).

[10] See, e.g., *McClain v. State*, 267 Ga. 378, 383 (477 SE2d 814) (1996).

the State violated this prohibition in its closing argument.[11]

The next question is whether Braithwaite's trial counsel was deficient in not objecting to this improper argument. As trial counsel testified at the motion for new trial hearing, he recognized the impropriety of the State's argument, but decided that objecting and drawing attention to the argument would be worse for his client than ignoring it and hoping the jury would too. With the benefit of hindsight, one can always argue that trial counsel's failure to object was something that no reasonable trial lawyer would do. Our task, however, is to determine whether, in the throes of closing argument, no reasonable attorney, listening to the inflection of the speaker's voice and judging the jurors' reactions, would choose to remain silent instead of objecting and calling attention to the improper argument. Here, Braithwaite's attorney reasonably chose silence, and we will not use hindsight to second-guess that decision on appeal.[12]

Because the dissent takes issue with our assessment of the reasonableness of the trial attorney's strategic decision, we also will consider the prejudice prong of Braithwaite's ineffective assistance of counsel claim: whether Braithwaite has shown that, but for counsel's failure to object to the State's improper golden rule argument, there was a reasonable probability that Braithwaite would not have been convicted.[13] Braithwaite's principal defense was that he was not present, but the evidence of his presence at the crime scene was overwhelming. Furthermore, defense counsel, whose closing argument followed the State's argument, acknowledged the tragedy that had occurred and the heinousness of the crimes, but refocused the jury's attention on the specific evidence presented. Therefore, we conclude that Braithwaite has failed to demonstrate that the failure to object prejudiced his defense because trial counsel sought to mitigate the prejudice arising from the argument and the evidence against Braithwaite was overwhelming.

3. The trial court did not err by permitting appellant's ex-wife to testify without first informing her on the record of the marital privilege. OCGA § 24-9-23 states that one spouse is competent to testify against the other, but cannot be compelled to do so. The testifying spouse is the one who may decide whether to rely on the marital priv-

---

[11] We find unpersuasive the distinction the concurrence draws between proper and improper arguments, and conclude, as does the dissent, that the entire portion of the closing argument focusing on the feelings of the victims and their families violated the prohibition against "golden rule" arguments.

[12] See *Holmes v. State*, 273 Ga. 644, 648 (543 SE2d 688) (2001) (where objection may highlight point made by prosecutor, failure to object may be valid strategic decision); *Milner v. State*, 271 Ga. 578, 579 (522 SE2d 654) (1999) (failure to object to closing argument to avoid highlighting unfavorable evidence was reasonable trial strategy).

[13] See *Strickland*, 466 U. S. at 687.

ilege, not the non-testifying defendant.[14] Appellant's ex-wife stated at trial that she testified voluntarily, and absent evidence to the contrary, we presume that she did so after waiving the marital privilege.[15] For the same reason, Braithwaite's trial counsel's failure to ask Braithwaite's wife whether she wished to waive the marital privilege did not constitute deficient performance.

4. In addition to the grounds discussed above, Braithwaite claims that his trial counsel was constitutionally ineffective for two other reasons. Neither contention has any merit. First, counsel pursued the reasonable trial strategy of not objecting to the ex-wife's testimony regarding crimes that Braithwaite committed against her and, instead, attempted to show during cross-examination that her testimony was false. Second, we agree with the trial court that trial counsel conducted sufficient pre-trial investigation and adequately cross-examined police investigators regarding other individuals suspected of committing these crimes.

5. Ward testified at trial that his involvement in the crimes was minimal, and Braithwaite's involvement was substantial. Braithwaite contends that the prosecutor suborned perjury from Ward because, during closing arguments, the prosecutor stated that "half the stuff out of [Ward's] mouth — I don't think he could tell the truth if he wanted to." Having reviewed Ward's testimony and closing arguments, we conclude that the prosecutor was not saying that he had offered perjured testimony. Rather, his statement was intended to comment on (1) Ward's testimony that, even though he pled guilty to robbery by intimidation, he did not commit that crime, and (2) the inconsistencies between Ward's various statements to the police and prosecutors, both of which Braithwaite referenced when cross-examining Ward. Accordingly, this enumeration is without merit.

6. The State's argument that Braithwaite had changed his appearance before trial to present a more favorable appearance to the jury was consistent with the evidence. Therefore, it was not improper.[16]

7. The trial court erred by instructing the jury that it could presume intent to kill from the use of a deadly weapon.[17] Although intent was not specifically at issue because Braithwaite's defense was that he was not at the crime scene, intent is still one of the elements that the State must prove beyond a reasonable doubt in a malice murder prosecution. Here, the evidence was overwhelming that who-

---

[14] *James v. State*, 223 Ga. 677, 683 (157 SE2d 471) (1967).
[15] *Mapp v. State*, 191 Ga. App. 622 (382 SE2d 618) (1989).
[16] See generally *Morgan v. State*, 267 Ga. 203, 203 (476 SE2d 747) (1996); *Head v. State*, 254 Ga. App. 550, 552 (562 SE2d 815) (2002).
[17] *Harris v. State*, 273 Ga. 608 (543 SE2d 716) (2001).

ever committed the murders committed them with malice. Once the jury determined that Braithwaite participated in the murders, there was overwhelming evidence that the killings were done with malice. The improper *Harris* charge was harmless because there is a high probability that the improper charge did not contribute to the jury's verdict.[18]

8. Braithwaite contends that he could not be convicted of three counts of possessing a firearm during a crime because the same firearm was used to commit all three murders. Even though OCGA § 16-11-106 must be construed strictly against the State because it is a criminal statute,[19] the plain language of the statute demonstrates that Braithwaite was properly convicted of possessing a firearm during each of the three murders for which he was convicted.

The relevant portion of OCGA § 16-11-106 (b) defines the crime of possession of a firearm during a felony as follows:

> Any person who shall have on . . . his or her person a firearm or knife having a blade of three or more inches . . . during the commission of, or the attempt to commit, any crime against or involving the person of another [among other enumerated crimes] . . . and which crime is a felony, commits a felony.

The unambiguous language of subsection (b) makes it a felony to possess a firearm when committing a felony against another person. Subsection (e) of the same statute further provides that "[a]ny crime committed in violation of subsection[ ] (b) . . . of this Code section shall be considered a separate offense." Here, Braithwaite committed three murders, each of which was a separate felony against a person. For each murder, he had possession of a firearm, whether physically or constructively as a party to the crime. Because there were three murders, he possessed a firearm in violation of OCGA § 16-11-106 (b) three times, even though it was the same weapon. Accordingly, he was properly charged and convicted of three counts of possession of a firearm during a crime against a person, one for each of the three murders.

9. Braithwaite contends that the trial court sentenced him to three consecutive five-year terms of imprisonment on the firearm convictions because it erroneously believed that it lacked discretion to have these sentences run concurrently. OCGA § 16-11-106 (b) requires the trial court to impose a five-year sentence for each firearm possession conviction and also requires that each sentence run

---

[18] See *Johnson v. State*, 238 Ga. 59, 61 (230 SE2d 869) (1976).
[19] *Hughes v. State*, 269 Ga. 819, 821 (504 SE2d 696) (1998).

consecutively to any other sentence received. We have construed that language to mean that a firearm possession sentence must only run consecutively to the sentence for its underlying felony conviction.[20] The trial judge retains discretion to make separate firearm possession convictions run concurrently to each other,[21] but is not required to exercise its discretion in that manner.[22] Here, the trial court decided that all of Braithwaite's sentences should run consecutively to one another, which was within its discretion, and the record does not show that the court made this decision under a misapprehension about the scope of its discretion.

10. Braithwaite's remaining enumerations of error were waived because he failed to raise them at trial.[23] Accordingly, we will not consider them for the first time on appeal.

*Judgment affirmed. All the Justices concur, except Benham, Hunstein and Thompson, JJ., who dissent.*

SEARS, Presiding Justice, concurring.

I fully concur with the majority opinion that appellant has not established his trial counsel was ineffective for failing to object to the prosecution's "golden rule" argument. I write separately, however, because I believe this Court should speak more precisely on what sort of argument constitutes a violation of the "golden rule." Even though appellant has waived any claim of a "golden rule" violation in this particular case, I nonetheless take this opportunity to offer my thoughts on the issue.

This Court has frequently held that regardless of the nomenclature used, it is improper for a prosecutor to ask jurors to place themselves in a victim's position.[24] When such statements are made in violation of the "golden rule," they must be carefully scrutinized in order to ensure that a defendant's right to a fair trial has not been harmed.[25] However, as held by this Court less than six months ago, a prosecutor's violation of the "golden rule" is subject to harmless error analysis.[26]

---

[20] *Busch v. State*, 271 Ga. 591, 593-594 (523 SE2d 21) (1999).

[21] See id.

[22] Id.

[23] *Merritt v. State*, 255 Ga. 459, 460 (339 SE2d 594) (1986). These include appellant's claims that the trial court: (1) improperly allowed evidence of crimes committed against his ex-wife; (2) improperly admitted the ex-wife's testimony that she believed what her husband told her about the victims' murders; (3) improperly allowed evidence regarding appellant's arrest in other states; and (4) improperly allowed victim impact testimony.

[24] See, e.g., *McClain v. State*, 267 Ga. 378, 383 (477 SE2d 814) (1996).

[25] *McClain v. State*, 267 Ga. at 383.

[26] *Carr v. State*, 275 Ga. 185, 186 (563 SE2d 850) (2002). See also *Greene v. State*, 266 Ga. 439, 446-447 (469 SE2d 129) (1996), rev'd on other grounds, 519 U. S. 145 (117 SC 578, 136 LE2d 507) (1997); *Burgess v. State*, 264 Ga. 777, 785 (450 SE2d 680) (1994); *Green v.*

While our appellate courts have maintained that "golden rule" arguments are improper, we have provided very little guidance as to what exactly constitutes a prohibited "golden rule" argument. As noted, we have recognized that a "golden rule" argument occurs when jurors are invited "to place themselves in the victim's place in regard to the crimes" at issue in a trial.[27] Yet our courts have issued conflicting rulings on the question of when this occurs. For example, we have held that the "golden rule" is violated where the State urges jurors to: "ask yourself [to imagine that] you are nine months pregnant and a . . . man comes in the room, puts a gold gun to your head and says lay down, I'm going to tie you up. . . ."[28] We have also found a violation of the golden rule occurs where jurors are simply asked what they would have done were they in the same situation as the victim of an aggravated assault.[29]

On the other hand, though, our courts have refused to find a violation of the "golden rule" in what might appear to be obvious cases. For example, in a prosecution for child molestation in which the child victim testified, the State urged the jury during closing arguments to:

> "[t]hink about it, how would you like to walk over here, walk up these stairs and sit in this chair and have this microphone in your face and talk to twelve grownups, twelve people you've never met before, about the last time you had sex. . . . Is that an easy thing to do? Is that something that you would want to do? . . . [L]ook at it from the children's eyes. The right thing to do? It ruins their lives to tell . . . to live through it, but look what happens to them when they tell about it. Nobody believes them."[30]

Even though this argument plainly asked jurors to place themselves in the victim's shoes, our Court of Appeals, in a full court opinion, unanimously agreed that this argument did not "fit neatly within the

---

*State*, 249 Ga. App. 546, 554 (547 SE2d 569) (2001); *Richards v. State*, 232 Ga. App. 584 (502 SE2d 519) (1998); *Horne v. State*, 192 Ga. App. 528, 529 (385 SE2d 704) (1989).

[27] *Richards*, 232 Ga. App. at 588. See *McClain v. State*, 267 Ga. at 383 (describing a "golden rule" argument as "[a]ny argument, regardless of nomenclature, which importunes the jury to place itself in the position of the victim for any purpose."); *Horne v. State*, 192 Ga. App. at 529 ("in a classic 'golden rule argument' jurors are invited to place themselves in the victim's place in regard to the crime itself.").

[28] *Burgess v. State*, 264 Ga. at 785; see *Green v. State*, 249 Ga. App. at 553 ("golden rule" violated where State urges jurors to "[i]magine you are in your bed laying [sic] there and all of a sudden(,) here is someone with a knife to your throat, ripping your clothes off, having sex with you," etc.).

[29] *Greene*, 266 Ga. at 446.

[30] *Horne*, 192 Ga. App. at 528-529.

category of [the] so-called 'golden rule' arguments."[31] Similarly, this Court has very recently held it was not improper during closing arguments for the State to urge the jury to "be the voice of (the victim)."[32] Despite the "golden rule's" prohibition against "importun[ing] the jury to place itself in the position of the victim for any purpose,"[33] we unanimously held in that case that the argument "was not an improper inflammation of the juror's [sic] emotions."[34] Additionally, this Court has also held that the State does not err by urging the jury during closing arguments to "return one for [the victim]."[35]

The mixed signals sent by this conflicting precedent are compounded by other rulings that accord prosecutors extraordinary leeway in fashioning their closing arguments. Generally speaking, Georgia's appellate courts have permitted the State wide latitude during closing arguments so that it can "[sum] up its case graphically and forcefully."[36] During closing argument, the State is appropriately permitted to sympathetically portray the victims of a crime.[37] Moreover, prosecutors can go to extreme lengths when portraying criminal defendants in the most negative light imaginable. We have allowed the State during closing argument to compare a defendant's actions to the Gestapo's crimes against European Jews during World War II;[38] to compare a defendant to serial killers such as Charles Manson and Jack the Ripper;[39] to compare a defendant to the Viet Cong and say that his return to society would be a greater danger than the threat of communism;[40] and to refer to a defendant as a brute, a beast, an animal and a mad dog who does not deserve to live.[41] One noted commentator has not hesitated to characterize these rulings as permitting arguments that come very close to impinging upon a criminal defendant's fundamental right to a fair trial.[42] Yet, as explained above, we purport to limit what a prosecutor may say during closing argument with the "golden rule's" prohibition against "importun[ing]

---

[31] Id., 192 Ga. App. at 529.

[32] *Carr v. State*, 275 Ga. at 186.

[33] *McClain v. State*, 267 Ga. at 383.

[34] *Carr*, 275 Ga. at 186.

[35] *Wellons v. State*, 266 Ga. 77, 85 (463 SE2d 868) (1995).

[36] 23A CJS, Criminal Law, § 1257, p. 149.

[37] See 23A CJS, Criminal Law, § 1270 (c), p. 173.

[38] *Forehand v. State*, 235 Ga. 295 (219 SE2d 378) (1975); see *United States v. Frost*, 77 F3d 1319 (11th Cir. 1996).

[39] *Ward v. State*, 262 Ga. 293, 297 (417 SE2d 130) (1992); see *Pace v. State*, 271 Ga. 829, 841 (524 SE2d 490) (1999).

[40] *Martin v. State*, 223 Ga. 649, 650 (157 SE2d 458) (1967).

[41] *Miller v. State*, 226 Ga. 730, 731 (177 SE2d 253) (1970), vacated on other grounds, 229 Ga. 731 (194 SE2d 410) (1972); see *Berryhill v. State*, 235 Ga. 549, 552 (221 SE2d 185) (1975); *Bruce v. State*, 142 Ga. App. 211, 215 (235 SE2d 606) (1977).

[42] Daniel, Georgia Criminal Trial Practice, § 23-6, p. 737.

the jury to place itself in the position of the victim for any purpose."[43]
A leading treatise instructs that:

> The "[g]olden [r]ule" argument is one which, either directly
> or by implication, tells the jurors that . . . they should put
> themselves in the injured person's place and render such a
> verdict as they would wish to receive were they in the
> [injured person's] position.[44]

To my mind, a "golden rule" argument is impermissible because it
asks jurors to abandon their objectivity and neutrality, put them-
selves in the shoes of the injured party, and then reach a verdict
based upon what they imagine the victim's subjective considerations
might be if he or she were on the jury.[45] It seems to me that in order
to be impermissible, a "golden rule" argument must hypothetically
ask the jurors to consider what verdict they would want delivered if
they or a member of their family were the injured party or victim of a
crime.[46]

Accordingly, I do not believe that a "golden rule" argument is
improper merely because it invokes vivid imagery of what a victim
experienced during the commission of a crime or crimes. So long as
such images may be drawn from the evidence introduced at trial,
they may be invoked during closing arguments to the jury. To be
impermissible, a "golden rule" argument must ask jurors — either
directly or by implication — to perform their duties and deliberations
as if they or someone they care for were the victim or injured party.
As such, the danger presented by a "golden rule" argument is its
attempt to give voice to a victim's desire (imaginary or otherwise) for
retribution, revenge or vengeance. Jurors, however, should render
their verdict based upon their consideration of facts submitted to
them, the issues framed by the pleadings, and the legal principles at
stake,[47] without regard for vigilantism.

The prosecutor's argument in this case asked the jury seven
times to imagine "what it must have been like" for the victims in this
case as appellant and his cohorts invaded their residence, bound and
gagged them, and systematically shot them to death. The prosecutor
also asked the jury to imagine "what it must have been like" for the
mother of one victim, who found the bodies. The images conjured by
these statements were readily discernible from the evidence of record

---

[43] *McClain v. State*, 267 Ga. at 383.
[44] 75A AmJur2d, Trial, § 650, p. 260.
[45] Id.
[46] Id.
[47] See Daniel, Georgia Criminal Trial Practice, § 25-1, p. 775.

and did not seek — either directly or implicitly — to have the jurors step into the victims' shoes and imagine what the victims' subjective considerations might be if they were on the jury. Accordingly, I do not believe that these statements, standing alone, violated the "golden rule."

However, the prosecutor also asked rhetorically (in reference to the invasion of two of the victims' bedroom): "Do you scream? Well, they couldn't do that because [the perpetrators had] stuffed socks in their mouth[s]. Do you fight back? These men have guns." With these statements — "Do you scream? Do you fight back?" — the prosecutor invited the jurors to imagine that they were the victims in this case and sought to have the jurors ask themselves what they would do in that situation. I believe this crossed the threshold of an impermissible "golden rule" argument by exhorting the jury to deliberate on the victim's subjective considerations. It also implicitly sought to give the victims a voice on the jury as it carried out its duties. Therefore, had this issue not been waived at trial, I would conclude that this particular portion of the State's closing argument violated the "golden rule."

As explained above, when confronted with an improper "golden rule" argument, we employ a harmless error analysis and determine whether it is highly probable that the prosecutor's misconduct contributed to the jury's verdict of guilt.[48] Notwithstanding appellant's waiver of this issue, I am confident that the evidence in this case, as explained in the majority opinion, was sufficient to render harmless any error associated with the improper "golden rule" argument.

HUNSTEIN, Justice, dissenting.

The Fulton County assistant district attorney began his closing argument in appellant's trial for the murders of Chauncey Fleming, Eddie McMillian and Nekeba Turner, with the following language:

> Two 18-year-old kids, sleeping in their house, never done anything wrong, not bothering anybody, engaged to be married, recent graduates from high school, both working, promising careers, maybe college.
>
> What must it have been like to be in that bedroom, minding your own business when five men come in there, order you get down face first? Do you scream? Well, they couldn't do that because they'd stuffed socks in their mouth. Do you fight back? These men have guns.
>
> What must it be like laying there next to the man you love, your face covered up so you can't see but you can hear everything? What must it be like when that first shot was

---

[48] See note 26, supra, and accompanying text.

fired into Eddie Fleming's [sic] back and she's laying there right next to him? And he can still talk. He can still move his head and she has to sit there and listen. And then they wait.

And what must it be like while the men are deciding who the next shot is going to be fired from? She's laying there waiting. The blood is pouring out of Eddie's back, who's right next to her. The men decide. A second shot is fired — she's inches away from it — into the head of Eddie McMillian.

What must it have been like for Eddie McMillian as he lay paralyzed? And then what was it like when Nekeba Turner as she lay there waiting for her turn to die?

A few short statements later the ADA resumed this line of argument:

What was it like for Chauncey Fleming as he lay there all tied up listening to his friends being killed knowing his turn is coming? And one last piece of worthless metal takes Chauncey's life. I mean the last images anybody has of him is laying there tied up at the ankles and the arms and around the head.

And what must it be like to be Eddie McMillian's mother and find those bodies? . . .

Georgia law has long acknowledged in both civil and criminal trials that it is "highly improper" during closing argument to ask jurors to place themselves in the position of a party or of the victim. *Doe v. Moss*, 120 Ga. App. 762, 767 (172 SE2d 321) (1969) (civil); see *Wolke v. State*, 181 Ga. App. 635 (3) (353 SE2d 827) (1987) (criminal). "In a classic 'golden rule' argument, jurors are invited to place themselves in the victim's place in regard to the crime itself. [Cit.]" *Horne v. State*, 192 Ga. App. 528 (2) (385 SE2d 704) (1989). Such an argument is impermissible because "it encourages the jurors to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." (Footnote omitted.) 75A AmJur2d, Trial, § 650, p. 260. "A juror must preserve his objectivity if he is to perform his duty in rendering a fair verdict that will do justice between the parties." *Doe*, supra at 767. Accordingly, "any argument, regardless of nomenclature, which importunes the jury to place itself in the position of the victim for any purpose," *Horne*, supra at 529 (2), is strictly prohibited under Georgia law during closing argument in criminal or civil cases. See *Doe*, supra (civil); *Wolke*, supra (criminal).

The argument quoted above reveals that the prosecutor repeatedly and deliberately encouraged the jurors to place themselves in the murder victims' place and imagine for themselves what it must

have been like as the crimes occurred, as the victims lay there help-less while shots were fired and friends and loved ones were murdered. The prosecutor even called upon the jurors to imagine themselves in the place of the mother of the murder victim who discovered the bodies. This language was not merely "vivid imagery of what a victim experienced" during a crime, as the concurrence would characterize it,[49] but rather constituted an impermissible golden rule argument that " 'invited [jurors] to place themselves in the victim's place in regard to the crime itself. (Cit.)' [Cit.]" *Burgess v. State*, 264 Ga. 777, 785 (20) (450 SE2d 680) (1994). Under these circumstances there can be no question that the prosecutor's use of a golden rule argument was error.

Although Georgia law is well established that use of a golden rule argument is clear error and despite the majority's concession that an impermissible golden rule argument was made in this case, the majority concludes that trial counsel's performance was not deficient for failing to object to this argument. Citing two cases that fail to support its position, the majority decides that because defense counsel deliberately "chose silence" as his response to the prosecution's egregious argument, defense counsel's performance cannot be deficient. According to the majority, such a decision, when deliberately made, becomes untouchable and any review of that decision is inappropriate "hindsight" and "second-guessing."

I do not agree with the majority that error by trial counsel is unreviewable merely because the error was intentional. A deliberate decision by trial counsel can constitute deficient performance just as easily as an inadvertent lapse. Invoking the words "tactics" and "strategy" does not automatically immunize trial counsel against a claim that a tactical decision or strategic maneuver was an unreasonable one no competent attorney would have made under the same circumstances. "Tactics" and "strategy" provide no talismanic protection against an ineffective assistance of counsel claim. Nor can invoking the phrases "hindsight" and "second-guessing" justify an appellate court's failure to perform its function as a reviewing court to deter-

---

[49] The concurrence reaches this conclusion by viewing the above language "standing alone," id., totally disregarding the well-established rule that closing argument is construed in the context of the argument as a whole. See, e.g., *Jones v. State*, 267 Ga. 592 (3) (481 SE2d 821) (1997); *Thornton v. State*, 264 Ga. 563, 567 (4) (a) (449 SE2d 98) (1994). By ignoring the context of the words and mischaracterizing the plain nature of the prosecution's "what it must be like" argument, the concurrence's conclusion is also contrary to well-established law prohibiting "any argument, *regardless of nomenclature*, which importunes the jury to place itself in the position of the victim *for any purpose*." (Emphasis supplied.) *Horne*, supra at 529 (2). The concurrence's rationale would also adversely affect civil litigation, in that it would allow counsel for civil litigants to freely ask juries "what it must be like" for injured plaintiffs when determining monetary damages, a practice prohibited by our rules against golden rule arguments in civil cases. See *Doe*, supra.

mine whether the "tactical judgment of [trial counsel] was outside the wide range of reasonably effective assistance. [Cit.]" *Jefferson v. Zant*, 263 Ga. 316, 320 (3) (b) (431 SE2d 110) (1993) (addressing Jefferson's habeas corpus claims that trial counsel rendered ineffective assistance in regard to their strategy and tactics).

Applying the appropriate analysis to this case, trial counsel's decision to remain silent in the face of the prosecutor's prolonged and egregious golden rule argument was a decision no reasonable defense counsel would have made under the same circumstances. The Fulton County Assistant District Attorney deliberately used this prohibited argument as part of a strategy designed to undermine the fairness of Braithwaite's trial by importuning the jury at length to review the evidence not from a dispassionate distance but from the subjective viewpoint of the crime victims and their families. This was not an instance in which only a "short portion" of the prosecutor's statement contained an improper golden rule argument. Compare *Caylor v. State*, 255 Ga. App. 362 (2) (566 SE2d 33) (2002) (tactical decision not to object to limited golden rule argument in opening statement held not deficient). The improper argument was not a single reference or erroneous comment that could justify counsel's decision not to object and draw attention to the error. See, e.g., *Hines v. State*, 248 Ga. App. 752 (3) (548 SE2d 642) (2001) (one statement); see also *Carr v. State*, 275 Ga. 185, 186 (2) (563 SE2d 850) (2002) (one "erroneous comment" harmless error). The golden rule argument in Braithwaite's case was the polar opposite of these accidental lapse or momentary reference types of situations: the prohibited argument was a prolonged and significant portion of the State's closing that the prosecutor placed at the very beginning of his remarks for the purpose of focusing the jury on how they should review the evidence adduced at trial.

Nor was this an instance in which any reasonable attorney could have seen the improper argument as favorable to Braithwaite in any manner. Compare *Graham v. State*, 251 Ga. App. 395 (2) (d) (554 SE2d 528) (2001) (defense counsel reasonably believed it benefitted client to remain silent when State commented in closing argument that client had originally been charged with burglary but due to lack of proof the State had reduced the charge to theft by receiving). Although the majority hypothesizes about counsel listening to "inflection" and observing "jurors' reactions," this was not an instance in which any reasonable defense counsel could have thought the jury would ignore the impassioned conduct of the prosecutor and "see through" the improper argument, compare *Hudson v. State*, 250 Ga. 479, 486 n. 11 (299 SE2d 531) (1983), because the jurors in Braithwaite's case had no reason whatsoever to believe the prosecution's argument constituted "rantings and ravings" they needed to "see through." Absent objection by defense counsel, there was nothing

to clue the jury into realizing they should ignore or discount as improper a golden rule argument so commonly used in popular entertainment. See, e.g., the golden rule argument from the closing argument in the movie "Class Action" cited in Johnson, Boom to the Skilled, Bust to the Overzealous, 69-May Florida Bar Journal 12 (1995). See also Montz, Why Lawyers Continue to Cross the Line in Closing Argument: An Examination of Federal and State Cases, 28 Ohio N.U. L. Rev. 67 (2001).

There was no reasonable tactical advantage to remaining silent in the face of a golden rule argument that inaccurately informed the jury that it was fair and proper for them to review the evidence from the perspective of the crime victims and their families. There was no reasonable tactical advantage to be gained by abetting the State's deliberate strategy to subvert the jury's duty to render a fair and impartial verdict based upon an objective application of the law to the facts. No reasonable attorney hearing this prolonged and egregious violation of the rule against golden rule arguments would remain silent because no reasonable attorney under the same circumstances would believe that a jury would "ignore" this persuasive but improper argument. Certainly no reasonable attorney could possibly believe any injury to his client would result from "drawing attention" to a misleading and damagingly erroneous standard of evidentiary review.

In assessing the strategic decisions of trial counsel, this Court is not concerned with what the best lawyer might have done or even what most good lawyers might have done. " 'We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . [. W]e are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.' [Cit.]" *Jefferson v. Zant*, supra, 263 Ga. at 318 (3) (a). It is not "us[ing] hindsight to second-guess" trial counsel's decisions when we perform this constitutionally-mandated analysis. When that analysis is applied to this case, it is patently obvious that trial counsel's decision to "choose silence" rather than protect his client's fair trial rights by raising an objection, thereby alerting the jury that it could *not* assess the evidence through the eyes of the crime victims, constituted deficient performance under the first prong of the *Strickland v. Washington* analysis.

Nothing in the cases cited by the majority supports its contrary holding. In *Holmes*, supra, defense counsel's decision to remain silent served to avoid emphasizing damaging evidence that showed his cli-

ent had committed other, uncharged crimes.[50] *Milner*, supra, lacks any information about the nature of the prosecutor's closing argument and its analysis consists of the single statement that "trial counsel's failure to object further to the prosecutor's closing argument or the trial court's instructions to the jury was not deficient or prejudicial." Id., 271 Ga. at 579 (2). Stripped of all facts or analysis, *Milner* provides no persuasive support for the majority's position and serves only to highlight how the majority, by following *Milner*'s lead, seeks to insulate its holding from informed review by stripping its opinion of all details of the State's egregious argument and providing only bare conclusions rather than a balanced analysis of Braithwaite's claim.

Accommodating this dissent, the majority purports to analyze the second prong of Braithwaite's ineffective assistance of counsel claim only to sweep the error under the umbrella of "overwhelming evidence." In assessing the prejudice component, the standard is whether a defendant has shown that there is "a reasonable probability (i.e., a probability sufficient to undermine confidence in the outcome) that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith v. Francis*, 253 Ga. 782, 783 (325 SE2d 362) (1985), applying *Strickland v. Washington*, supra. In Braithwaite's trial, the question is whether there is a reasonable probability the verdict would have been different had the prosecution not been allowed to repeatedly and deliberately importune the jury to place itself in the position of the victims and had the jury not been allowed to deliberate on the evidence in this case under the mistaken understanding that it was fair and proper to review that evidence while imagining themselves in the place of the crime victims and their families.

The majority, in its assessment of the prejudice component, once again follows the lead of *Milner* by providing such an abbreviated recital of the facts that its conclusion sounds unchallengeable. What the majority's synopsis of the evidence at trial fails to reflect, however, is that the "overwhelming" evidence adduced by the State at trial consisted only of testimony by two of the men involved in the murders, Ward and Davis, and testimony by Braithwaite's estranged

---

[50] The challenged closing argument consisted of the prosecutor's reiteration of trial evidence showing that after Holmes shot the victim, he also struck the victim in the head. The prosecutor's error was in arguing that by striking the victim Holmes committed aggravated assault, although Holmes had been indicted only for aggravated assault by shooting the victim. This Court speculated, in the absence of any evidence from defense counsel, that the attorney had decided not to "highlight" the additional assault (which the prosecutor would have been authorized to discuss under the evidence) by objecting on the legal technicality that Holmes had not been indicted on that particular assault. *Holmes*, supra, 273 Ga. at 648 (5) (c).

wife, who purportedly was told by Braithwaite of his involvement in the crimes during an argument between the couple over the wife's love affair with witness Davis. Davis testified at trial that he had a sexual relationship with Braithwaite's wife and the estranged wife testified that, although not divorced, she was no longer using Braithwaite's name. Both Davis and Ward received favorable sentences in exchange for their testimony: Ward was sentenced to a total of 22 months (time served) for his involvement in the three murders; Davis, who admittedly participated in the planned robbery and murder of Fleming and personally shot Eddie McMillian in the back, was allowed to plead guilty to voluntary manslaughter and received a 25-year sentence.

While the credibility of these witnesses was for the jury, see *Jenkins v. State*, 269 Ga. 282 (5) (498 SE2d 502) (1998), and I fully concur with the majority that the evidence against Braithwaite was sufficient under *Jackson v. Virginia*, supra, the evidence adduced at trial could not reasonably be considered to be "overwhelming." There were no fingerprints, no blood splatters or other forensic evidence to connect Braithwaite to the crimes. No stolen goods were found in his possession; the murder weapon was recovered from another person. There was no testimony by a disinterested third party and no incriminating statements to police. Braithwaite's conviction rested solely on details provided by an adulterous wife who could have obtained her information from her lover Davis, and the testimony of Davis and Ward, given in exchange for more lenient jail time.[51] This evidence was sufficient to support the guilty verdicts but it was by no means "overwhelming."

As the majority's holding in this case amply demonstrates, "overwhelming evidence" no longer depends upon the amount and quality of evidence of guilt adduced at trial. Instead, "overwhelming evidence" has become the catch phrase that excuses all error. No matter how excessive the argument or how impassioned the prosecutor's plea, all is forgiven because "overwhelming evidence" was adduced. Despite the perversion this makes of our Court's rulings, the continued abuse it encourages among prosecutors, and the hypocrisy it

---

[51] The majority also contends that defense counsel's closing argument played a factor in its finding of no prejudice because counsel "refocused the jury's attention on the specific evidence presented." However, the problem with the prosecutor's argument did not lie with any discussion of the "specific evidence presented": it lay with the unrebutted exhortation to the jury regarding how to review that evidence. Nothing in defense counsel's closing argument "refocused" the jury on the correct manner in which they should review the evidence; nothing contradicted the jury's understanding that they could weigh the "specific evidence presented" from the subjective viewpoint of the crime victims and their families. Thus, contrary to the majority's position, nothing defense counsel said or did ameliorated the prejudice caused by the State's golden rule closing argument in this case.

foments between words and deeds, the bottom line is that when the evidence adduced at trial meets the *Jackson v. Virginia* standard, this Court will not reverse a criminal conviction over a prosecutor's use of any golden rule argument, no matter how extensive or damaging that argument is.

This Court has held that any use of an argument that calls upon a jury to place itself in the position of the victim " 'must be carefully scrutinized to ensure that no infringement of the accused's fair trial rights has occurred.' [Cit.]" *McClain v. State*, 267 Ga. 378, 383 (3) (a) (477 SE2d 814) (1996). When a "careful scrutiny" of this case is conducted, when all of the State's evidence of guilt is considered, the prosecution's golden rule argument is read in its entirety, and when defense counsel's decision to "choose silence" is properly analyzed, the result reached is that Braithwaite's fair trial rights were infringed upon by the State's closing argument. Counsel's decision not to object to the prosecutor's deliberate strategy to subvert the jury's duty to render a fair and impartial verdict based upon an objective application of the law to the facts was an unreasonable decision no competent attorney would have made under the same circumstance. Due to defense counsel's failure to object, the jurors went to their deliberations believing without contradiction from counsel or court that they could weigh the evidence adduced at trial from the subjective viewpoint of the victims of these crimes. In a case founded solely upon the testimony of three credibility-challenged witnesses, there is a reasonable probability that the failure of Braithwaite's counsel to object to the argument affected the jury's verdict. Accordingly, I cannot agree with the majority that Braithwaite received effective assistance of trial counsel.

Policy considerations also demand reversal of Braithwaite's case. It is well established in Georgia that use of a golden rule argument is strictly prohibited. Why, then, do prosecutors continue repeatedly to make these forbidden arguments? The answer is simple: this Court does not hold them accountable for their violation of our rulings. We gum the words of prohibition but there are no teeth to nip prosecutors into obedience. I cannot condone this Court's abandonment of its obligation " 'to ensure that no infringement of the accused's fair trial rights has occurred' " through the use of a prohibited golden rule argument, see *McClain*, supra, 267 Ga. at 383 (3) (a), in favor of a rubber stamp approach to the State's improper behavior. Nor can I condone the continuing violations of prosecutorial duty, propriety and restraint in regard to the prohibited use of golden rule arguments. As stated by the Supreme Court of Florida in addressing this precise same problem, "[i]t ill becomes those who represent the state in the application of its lawful penalties to *themselves* ignore the precepts of their profession and their office." *Bertolotti v. State*, 476

So2d 130, 133 (Fla. 1985).

For these reasons I must respectfully dissent to the majority's affirmance of Braithwaite's conviction.

I am authorized to state that Justice Benham and Justice Thompson join in this dissent.

DECIDED NOVEMBER 12, 2002 —
RECONSIDERATION DENIED DECEMBER 13, 2002.

*Charles H. Frier*, for appellant.

*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Christopher M. Quinn, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Tammie J. Philbrick, Assistant Attorney General*, for appellee.